65 F.3d 169
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Katherine D. BURTON, and Annette M. Moody, Defendants-Appellants.
 Nos. 94-2330, 94-2360.
 United States Court of Appeals, Sixth Circuit.
 Aug. 24, 1995.
 
 Before: WELLFORD, NELSON, and RYAN, Circuit Judges.
 RYAN, Circuit Judge.
 
 
 1
 This is a combined appeal of two defendants who were tried together with six others. Defendant Burton was convicted of four counts of wire fraud, in violation of 18 U.S.C. Sec. 1343; and one count of conspiracy, in violation of 18 U.S.C. Sec. 371. Defendant Moody was convicted of one count of wire fraud, in violation of 18 U.S.C. Sec. 1343, and acquitted of conspiracy charged under 18 U.S.C. Sec. 1343.
 
 
 2
 The combined appeals raise four issues. Defendant Burton claims that: 1) the district court erred in denying her motion for acquittal as to the four mail fraud counts because there was insufficient evidence to support the convictions; and 2) the numerous instances of prosecutorial misconduct combined to render her trial fundamentally unfair.
 
 
 3
 Defendant Moody claims that: 1) the district court clearly erred when it found at sentencing that the amount of loss for which she was responsible exceeded $70,000, and 2) the district court clearly erred when it refused to reduce her base offense level based on her role as a "minimal participant."
 
 
 4
 We conclude that all these assignments of error are without merit, and so we affirm Burton's conviction and Moody's sentence.
 
 I.
 
 5
 The indictment in this case charged a total of ten defendants with conducting a "bust out" scheme to defraud numerous victims. A bust out scheme involves the schemer setting up a wholesale business. The schemer then, on credit, buys quantities of goods from suppliers with the intention of never paying for the ordered goods. The schemer then sells the goods at auction or at flea markets at prices well below a reasonable retail value. The success of this scheme depends on the schemer keeping any one of the possibly many wholesale businesses open only for a short period of time, a few months at most. The scam works by getting goods on credit, selling the goods, closing down, and then "disappearing" before the creditors can catch up with the schemer.
 
 
 6
 The two defendants in this appeal were by no means the major moving forces behind the scheme involved here. Burton is the sister and daughter of two of the major participants. Moody is Burton's first cousin.
 
 
 7
 Burton's role in the scheme was as "secretary" to her brother, Donald Clark, at the wholesale business called Big Don's Wholesale, which was one of many such wholesale businesses. The "duties" by which she furthered the conspiracy included creating purchase orders, faxing or mailing these purchase orders, and also making false statements in phone conversations with the suppliers who, as creditors, called demanding payments.
 
 
 8
 Annette Moody played a different role. Her cousin, Donald Clark, asked her to pose as a credit reference for one of the wholesale businesses, Scribners Wholesale. When suppliers would call inquiring about the business's credit history, Moody would provide false information causing the supplier to believe that Scribners was a credit worthy establishment. This role was important for the conspiracy because most of the suppliers wanted credit references before they were willing to ship goods on credit.
 
 
 9
 Two of the indicted defendants pleaded guilty, and the remaining eight were tried together. The trial lasted nearly a month and involved more than 200 exhibits. Burton was sentenced to twelve months imprisonment on each of the five counts of conviction, each sentence to run concurrently; Moody was sentenced to thirteen months of imprisonment. Each defendant filed a timely notice of appeal.
 
 II.
 A.
 
 10
 Burton's first argument is that no rational trier of fact could believe that the acts constituting the four wire fraud counts in the indictment for which she was convicted could demonstrate the necessary intent to defraud. The standard upon which jury verdicts are reviewed limits the appellate court's inquiry to determining whether any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could find the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). In order to prove wire fraud under 18 U.S.C. Sec. 1343, the government must establish two elements: 1) a scheme to defraud, and 2) use of an interstate electronic communication in furtherance of the scheme. United States v. Smith, 39 F.3d 119, 122 (6th Cir.1994). The government must prove that the defendant had the intent to defraud. Id.
 
 
 11
 Burton argues that her conviction was based on statements many secretaries utter, that is, telling creditors "the check's in the mail" and lying about her boss's whereabouts. However, when Burton made the deliberately false statements, she did so with the intent to defraud the suppliers. While a jury would be justified in inferring the requisite intent from her acts, the most damning evidence of Burton's knowledge and intent came from her own confession. After she was arrested, she was interviewed by Special Agent Welsh of the FBI, who gave Burton a copy of the indictment, which she read at length, and then she agreed to make a statement in her own handwriting. At trial, a redacted version of this confession was read by Special Agent Welsh and was admitted into evidence.
 
 
 12
 After reviewing the lengthy and detailed confession, we are convinced that there was sufficient evidence for a rational jury to find that Burton had knowledge of the fraud and acted with the intent to defraud the suppliers. Indeed, she stated in her confession: "I admit that Counts 13, 14, 15 and 16 are generally true and accurate." These are the four wire fraud counts that she now challenges on appeal.
 
 
 13
 This assignment of error is wholly without merit.
 
 B.
 
 14
 In her second argument, Burton points to several statements made by the prosecutor and argues that they constituted prosecutorial misconduct that rendered the trial fundamentally unfair. When this court reviews a claim of prosecutorial misconduct, reversal of the conviction is only appropriate if the prosecutor's behavior was inappropriate and prejudicial. United States v. Driscoll, 970 F.2d 1472, 1484 (6th Cir.1992), cert. denied, 113 S.Ct. 1056 (1993). "[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context...." United States v. Young, 470 U.S. 1, 11 (1985). When a defendant claims that a prosecutor's comments amounted to plain error, this court's review should be limited to errors that are " 'so rank that they should have been apparent to the trial judge without objection, or that strike at the fundamental fairness, honesty, or public reputation of the trial.' " Driscoll, 970 F.2d at 1485 (quoting United States v. Causey, 834 F.2d 1277, 1281 (6th Cir.1987), cert. denied, 486 U.S. 1034 (1988)).
 
 
 15
 Recently, this court set out a framework for analyzing claims of prosecutorial misconduct. In United States v. Carroll, 26 F.3d 1380 (6th Cir.1994), the court set out a twofold inquiry: first, whether the challenged prosecutorial comment was inappropriate, and second, if it was, whether it was harmless error. To determine whether the error was harmless, the following four factors are appropriate: 1) "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused," including the extent to which corrective instructions were given; 2) "whether they were isolated or extensive"; 3) "whether they were deliberately or accidentally placed before the jury"; and 4) "the strength of the competent proofs introduced to establish the guilt of the accused." Id. at 1384.
 
 
 16
 Burton did not contemporaneously object to any of the comments about which she now complains. She asserts, however, that the objections that were made after the prosecution's opening, closing, and rebuttal arguments had been completed served to preserve her objections for appeal. After carefully reviewing the trial transcripts, however, we are convinced that only one of the objections was timely made, and it is the only one, therefore, that we shall address.
 
 
 17
 The prosecutor, in closing and rebuttal arguments, referred to "unrebutted" evidence. Burton's objection, which she renews here, is that this impermissibly shifted the burden of proof onto her. The district court did warn the prosecutor to refrain from using that term. The prosecutor used the term a total of three times. We conclude that, even if the use of this term was inappropriate, under the four-part analysis declared in United States v. Carroll, the improper use of the expression was harmless.
 
 
 18
 In conclusion, we believe that none of the prosecutor's comments about which Burton now complains, including those to which no timely objection was made, rose to the level of prosecutorial misconduct, and this assignment of error is, therefore, without merit.
 
 III.
 A.
 
 19
 Moody argues that the district court's determination of the amount of loss resulting from her acts was pure speculation and, therefore, clear error. The amount of loss resulting from an offense is a factual determination that is reviewed only for clear error. United States v. Jackson, 25 F.3d 327, 330 (6th Cir.), cert. denied, 115 S.Ct. 344 (1994). When sentencing a defendant for wire fraud, if the amount of loss exceeds $70,000, U.S.S.G. Sec. 2F1.1(b)(1)(G) directs that the defendant's base offense level be increased by six levels.
 
 
 20
 The district court need not make precise determinations regarding the amount of loss. United States v. Milligan, 17 F.3d 177, 183 (6th Cir.), cert. denied, 115 S.Ct. 211 (1994). The guidelines only require that the court "make a reasonable estimate, which may be founded on general factors such as the nature and duration of the fraud." Id.
 
 
 21
 The district court determined the amount of loss for which Moody was responsible as follows: Moody had served as a credit reference for Scribner Wholesale. The total loss for Scribner Wholesale was $200,000. Moody was one of three credit references, so the district court assigned Moody one-third of the loss, that is, $67,000. Moody also acted as a credit reference for A-Z Sales, and she was held accountable for one loss of $3,888. These two losses, added together, amount to $70,888, for which four levels should be added to the base offense level. The district court reduced the offense level by one, however, because the court wanted to be as fair as possible and not penalize Moody for an amount for which she was not responsible.
 
 
 22
 Moody argues that United States v. Watkins, 994 F.2d 1192 (6th Cir.1993), stands for the proposition that under Sec. 2F1.1, a defendant is only responsible for a loss if 1) the defendant intended the loss; 2) it was possible for the defendant to cause the loss; and 3) the defendant must have completed or been about to complete all acts necessary to bring about the loss. Moody's reliance on Watkins is misplaced. The rule announced in Watkins applies when the loss was merely an "intended loss," that is, if the fraud was prevented or failed before the loss occurred. In this case, the district court sentenced Moody based on an actual loss, not an intended loss. Watkins is inapposite. Cf. United States v. Flowers, 55 F.3d 218, 221 (6th Cir.1995).
 
 
 23
 On appeal, Moody complains that the $67,000 amount was arrived at by pure speculation and was not based on any evidence. At sentencing, Moody had a different view, however. The court described its method of calculating the loss, reached the figure of slightly more than $70,000, and then asked if Moody had any objections. Moody's only objection was:
 
 
 24
 I object to the court's methodology by using--by holding the credit references, one third each responsible for the whole Scribner loss. I understand the court's statements about the conservative nature of estimates, whatever, even the million dollars. My objection would be the credit references were not as important by any means or by any stretch of the imagination as the people scamming people on the phones and faxes and I don't think they should be held one third responsible. I think Mr. Scribner should be held 50 percent responsible at least, or even more, and then divide the remainder among the credit references. That is the general nature of my objection, so I would object.
 
 
 25
 At no time did Moody object that there was insufficient evidence that the Scribner loss was about $200,000, she only objected to being held accountable for a full one-third of that amount. Because Moody now objects to the amount of the Scribner loss for the first time, we conclude that she has waived this argument.
 
 
 26
 As to the objection Moody did make below, that is, that she should not be found responsible for one-third of the Scribner loss, we conclude that the district court did not clearly err because there was much evidence at trial suggesting that the phony credit references supplied by Moody played an important role in furthering the fraud. The sentencing guidelines do not require the district court to make precise findings as to the amount of loss. Indeed, a "reasonable estimate" based on "general factors" is sufficient. United States v. Milligan, 17 F.3d 177, 183 (6th Cir.), cert. denied, 115 S.Ct. 211 (1994).
 
 B.
 
 27
 Moody argues that she was substantially less culpable than the other participants in the conspiracy, and so the district court clearly erred when it refused to apply a reduction for minimal or minor participant under U.S.S.G. Sec. 3B1.2. The determination of the appropriateness or inappropriateness of a "role in the offense" enhancement or reduction is a factual determination that this court reviews only for clear error. United States v. Chalkias, 971 F.2d 1206, 1217 (6th Cir.), cert. denied, 113 S.Ct. 351 (1992).
 
 U.S.S.G. Sec. 3B1.2 provides:
 
 28
 Based on the defendant's role in the offense, decrease the offense level as follows:
 
 
 29
 (a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.
 
 
 30
 (b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.
 
 
 31
 In cases falling between (a) and (b), decrease by 3 levels.
 
 
 32
 The guidelines commentary explains "minor" and "minimal" participant as:
 
 
 33
 1. Subsection (a) applies to a defendant who plays a minimal role in concerted activity. It is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group....
 
 
 34
 ....
 
 
 35
 3. For purposes of Sec. 3B1.2(b), a minor participant means any participant who is less culpable than most other participants, but whose role could not be described as minimal.
 
 
 36
 U.S.S.G. Sec. 3B1.2, comment. (n. 1 & n. 3).
 
 
 37
 No one disputes that Moody played a much smaller role than most of the other defendants. However, the district court refused to award a minimal or minor participant adjustment because the court believed it had adjusted Moody's culpability in the calculations by basing her sentence on an amount for which she was actually responsible. The entire fraud involved in this case amounted to a loss of over $5 million. Moody's sentence, which included a one level reduction, represents a loss of between $40,001 and $69,999.99. U.S.S.G. Sec. 2F1.1(F). As to this loss, Moody was as culpable as any other defendant who could be said to have actually caused it. Under the district court's method of calculating the loss, Moody was not a minor participant in the offense for which she was sentenced, that is, a loss between $40,000 and $70,000.
 
 
 38
 In United States v. Walton, 908 F.2d 1289 (6th Cir.), cert. denied, 498 U.S. 990 (1990), this court was faced with a very similar argument from two defendants who had been very minor participants in a major cocaine conspiracy. The district court had refused to allow an adjustment under Sec. 3B1.2, but had sentenced them based on the amount of cocaine for which they had actually been actively involved rather than the much larger amount for which the conspiracy as a whole was responsible. On appeal, the defendants objected to not receiving the downward adjustment. In rejecting their argument, the court stated:
 
 
 39
 The evidence does establish that they were minor participants if one compares their activities to the scope of the conspiracy as a whole and the activities of the other defendants. We do not believe this is always the proper inquiry, however. In this case, the [defendants] have only been held responsible for cocaine that they were actively involved in distributing--not the additional amounts involved in the entire conspiracy. As to the distribution of this amount, they were not minor participants....
 
 
 40
 Id. at 1303. This reasoning applies equally in this case, and we therefore conclude that the district court did not clearly err in refusing to award Moody a reduction for being a "minimal participant."
 
 IV.
 
 41
 For the reasons stated above, Burton's conviction and Moody's sentence are AFFIRMED.