51 F.3d 273
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Michael GRAHAM (94-5069); Edward Joseph Blumenfeld, Jr.
(94-5070); Michael Fisk (94-5071); and, Edward
Joseph Blumenfeld, Sr. (94-5105),
Defendants-Appellants.
 Nos. 94-5069, 94-5070, 94-5071, 94-5105.
 United States Court of Appeals, Sixth Circuit.
 Feb. 21, 1995.
 
 Before: NORRIS and SUHRHEINRICH, Circuit Judges; MILES, Senior District Judge.*
 PER CURIAM.
 
 
 1
 On May 7, 1992, a federal grand jury returned a 118-count indictment charging six individuals and one corporate defendant with one count of conspiracy and 117 substantive counts to commit fraud for obtaining money from investors and working interests in oil wells by use of wire and mail in violation of 18 U.S.C. Secs. 2, 1341 and 1343. Four of those defendants, Edward Joseph Blumenfeld, Sr., Edward Joseph Blumenfeld, Jr., a/k/a Jody, Michael Fisk, and Michael Graham present challenges to their respective convictions and sentences in this consolidated appeal. We AFFIRM the convictions and VACATE the sentences of Blumenfeld Sr. and Fisk, and REMAND for resentencing.
 
 I.
 
 2
 Defendant Blumenfeld, Sr. d/b/a Southwestern Petroleum (and other similar names), in Memphis, Tennessee, sold "working interests" in oil wells to the public. Blumenfeld Jr., Fisk, and Graham were sales representatives for Blumenfeld Sr. The indictment alleged that defendants devised a scheme to defraud individuals to invest in oil wells that were virtually worthless, "re-entry" wells which had been previously abandoned because unproductive. Defendants used a gimmick whereby they would inform these individuals that, while "researching" the past history of a particular oil lease, they discovered that the individual was "a possible past interest holder," and that he or she had a limited time to exercise an "option" or it would revert back to defendants. If the prospective investor expressed interest, a confirmation letter would be sent. After the investor remitted the purchase price, defendants would send an operating agreement for signature and return to the company. The investor would then receive an assignment reflecting his or her interest in the well. Defendants represented that investors could expect a full return on their initial investment within twelve to eighteen months, even though this was unrealistic given the quantity of oil the wells were actually producing and given the fact that no investor had ever received such a return. A host of government witnesses testified at trial, including employees of Blumenfeld Sr., landowners who knew the wells were essentially nonproductive, the representative of the company whose drivers picked up most of the oil produced by Blumenfeld's wells during the relevant period, and a number of the victims.
 
 
 3
 The jury convicted Blumenfeld Sr. of conspiracy and various counts of mail fraud and wire fraud. He was sentenced to a total of seventy-one months. Blumenfeld Jr. was convicted of one count of mail fraud and aiding and abetting; and acquitted on a number of other counts, including the conspiracy charge. The district court sentenced him to twenty-seven months imprisonment. The jury convicted Graham of several charges of mail fraud and abetting, but acquitted him of the conspiracy count. He was sentenced to a total of thirty months imprisonment. Defendant Fisk was convicted of conspiracy and several counts of mail fraud and abetting. The lower court sentenced him to forty-six months imprisonment.
 
 II.
 A.
 
 4
 Defendants Blumenfeld Sr., Blumenfeld Jr., and Graham contend that the evidence was insufficient to convict them, and that their respective motions for judgment of acquittal should have been granted. We review the record to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).
 
 
 5
 Mail fraud consists of: (1) a scheme to defraud; and (2) use of the mails in furtherance of the scheme. United States v. Smith, --- F.3d ----, No. 94-5113, 1994 WL 617911, at * 2 (6th Cir. Nov. 9, 1994) (citing Pereira v. United States, 347 U.S. 1, 8 (1954)). Specific intent to deceive or defraud is required. Id. (citing Epstein v. United States, 174 F.2d 754, 765 (6th Cir.1949)). To establish wire fraud, the government must prove: (1) a scheme to defraud; and (2) use of an interstate electronic communication in furtherance of the scheme. Id., 1994 WL 617911, at * 3 (citing United States v. Morelli, 643 F.2d 402, 411-12 (6th Cir.), cert. denied, 453 U.S. 912 (1981)).
 
 
 6
 We have thoroughly reviewed the parties' briefs, supplemental briefs, and the joint appendix. We find ample proof in the record to support the convictions of all three defendants. Blumenfeld Sr.'s guilt is established, at a minimum, by the testimony of Perrin Shappley, a former employee of Blumenfeld Sr., and codefendant Jerry Hamilton. Defendant Graham's assertion that there is no proof of knowing misrepresentations of his status and/or identity is similarly belied by Hamilton's testimony. Further, given Graham's self-proclaimed experience in the oil industry, it is inconceivable that he was not aware of the scam.
 
 
 7
 Blumenfeld Jr. argues that there is no evidence that he caused the mailing or aided and abetted in the execution of a scheme to defraud as alleged in count 86. The record shows that South Central Petroleum sent a "confirmation" letter dated June 15, 1990, pertaining to Amos Flora Nos. 1 and 2 wells. The confirmation letter contained a breakdown of costs--setting drilling costs at $3000, and completion costs at $3000. Said confirmation was signed "Jody Blumenfeld." (See Taylor Trial Testimony, J.A. 423-25.) Further, Judy Youman Taylor testified that she saw this document at or near the time it is dated. (J.A. 424-25.) Thus, it is easily inferable that the two $3000 checks sent by Taylor on June 18, 1990, were in direct response to that confirmation letter. We think this sufficient proof to uphold the jury's finding.
 
 B.
 
 8
 Blumenfeld Sr. and Fisk both challenge the two-point upward adjustment to his sentence under U.S.S.G. Sec. 3A1.1, for preying on vulnerable victims.[1] The district court concluded that the enhancement was proper, finding that many of the victims were older persons with diminished capacities, and that defendants had specific knowledge of this fact through their contacts with several of the victims. Defendants argue that because they did not "target" vulnerable victims, merely sophisticated oil investors, their conduct therefore does not qualify for enhancement under Sec. 3A1.1.
 
 
 9
 Although the district court did not have the benefit of it, our recent decision in Smith, supra, makes clear that Sec. 3A1.1 does not apply unless the defendant "knew his victim was unusually vulnerable and that he perpetrated a crime on him because he was vulnerable. It is not enough to show that the victim happened to be vulnerable at the time the crime occurred." Smith, 1994 WL 617911, at * 6. In this case, most of the victims were elderly. However, there is no evidence that defendants selected their victims because of their age. Rather, the record reflects that the victims were chosen because they had previously invested money in oil-related investments. As in Smith, "any correlation between ... potential vulnerabilities and the fraudulent scheme[ ] ... was more coincidental than intentional." Id. Thus, the district court's decision to increase Blumenfeld Sr.'s and Fisk's base offense level under the victim vulnerability provision was clearly erroneous. Id.
 
 C.
 
 10
 Blumenfeld Sr. argues that the lower court erred in its calculation of the amount of loss attributable to his fraudulent conduct. The district court took the total amounts of payments made by the victims, roughly $1,600,000 to $1,700,000, and subtracted the $300,000 figure that the victims were actually paid in royalties. This resulted in an eleven-point enhancement under Sec. 2F1.1(b)(L) (Nov. 1993).[2] Blumenfeld Sr. contends that use of total deposits as the measure for valuing loss is illogical. He also claims that the lower court failed to account for the fact that many of the victims took tax write-offs for the amount of the loss, and still retain their interest in the wells.
 
 
 11
 The sentencing guidelines allow the district court "to make a reasonable estimate of loss attributable to fraud, based on all available information." United States v. McAlpine, 32 F.3d 484, 488 (10th Cir.1994) (citing, inter alia, U.S.S.G. Sec. 2F1.1, Application n. 8), cert. denied, --- U.S. ----, No. 94-6551, 1994 WL 597247 (U.S. Nov. 28, 1994). Application Note 8 provides that:
 
 
 12
 For purposes of subsection (b)(1), the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information. This estimate, for example, may be based on the approximate number of victims and an estimate of the average loss to each victim, or on more general factors, such as the nature and duration of the fraud and the revenues generated by similar operations.
 
 
 13
 U.S.S.G. Sec. 2F1.1, comment. (n. 8). The district court's calculations in this case were within the broad scope of authority permitted by the guidelines. Remarking that calculating loss was difficult, the court discussed the fact that most of the victims believed that they would be receiving returns for a long period of time. These statements regarding the nature of the fraud support the court's estimation of actual loss. See McAlpine, 32 F.3d at 489. Nor were the court's factual conclusions concerning the actual loss clearly erroneous. In arriving at the $1,700,000 figure, the court relied on the bank records of all known customers.
 
 
 14
 We likewise reject defendant's assertion that the actual loss figure should have been reduced by the tax benefits received by the victims for the reasons stated in McAlpine, 32 F.3d at 489. Moreover, the district court found that some of the victims did not take a write-off, a finding which is not clearly erroneous. Finally, although not discussed by the district court, our review of the record reflects that Blumenfeld Sr. himself paid minimal amounts for wells; thus any interest retained by the victims is ipso facto de minimus and would be insufficient to move the actual loss figure into a lower category for sentencing purposes. In sum, we hold that the method used by the district court in calculating loss was consistent with the guidelines.
 
 D.
 
 15
 Blumenfeld Sr.'s challenges to several evidentiary rulings do not merit discussion.
 
 III.
 
 16
 In sum, the judgment of the district court is AFFIRMED in part and REVERSED in part. Defendants' convictions are AFFIRMED, the sentences of Blumenfeld Sr. and Fisk are VACATED, and the case is REMANDED for resentencing in accordance with this opinion.
 
 
 
 *
 The Honorable Wendell A. Miles, Senior United States District Judge for the Western District of Michigan, sitting by designation
 
 
 [1]
 Defendant Fisk was sentenced on October 29, 1993, and is therefore subject to the November version of the 1992 guidelines. Defendant Blumenfeld Sr. was sentenced on November 2, 1993. His sentence is subject to the November 1993 edition of the guidelines. Notwithstanding, Sec. 3A1.1 is identical in both versions
 2 U.S.S.G. Sec. 2F1.1(b)(1)(L) provides for an eleven-point enhancement for losses between $800,000 and $1,500,000.