94 F.3d 645
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Donald E. HOY, Defendant-Appellant.
 No. 95-3698.
 United States Court of Appeals, Sixth Circuit.
 Aug. 13, 1996.
 
 Before: WELLFORD, NORRIS and DAUGHTREY, Circuit Judges.
 PER CURIAM.
 
 
 1
 The defendant-appellant, Donald E. Hoy, appeals his conviction rendered by a jury on one count of mail fraud, four counts of wire fraud, and one count of conspiracy. He contends that the district court committed clear error in calculating his sentence and in denying his motion for judgment of acquittal. For the reasons set out below, we find no reversible error and affirm.
 
 FACTUAL BACKGROUND
 
 2
 It was the government's theory at trial that the defendant had engaged in fraudulent activities with his co-defendants, Jack M. Penick and L. Merle Wells, from approximately December 1987 through 1992. The prosecution sought to establish that during that five-year period Penick, Wells, and Hoy raised money from individual investors for their business venture, known originally as Pictures to Glass International, Inc., and later changed to Poly Tri Star, Inc. The defendant maintained that he came to the venture late and had no intent to defraud.
 
 
 3
 The proof showed that sometime during the mid-1980's, before Hoy's involvement, Jack Penick formed a company known as Joint Ventures II with William Childers and Jim Ratliff. Childers had experience in the glass industry, and Ratliff had the technological know-how to place pictures on glass. At that time, the principals in Joint Ventures II were working with an individual named Bob Bayless, who owned a research company called Capsulated Systems, Inc. Bayless and his company had designed the technology to develop a polymer that would seal out moisture and sunlight when placing pictures on glass. The picture purportedly would remain permanently on the glass without risk of discoloration from exposure to sunlight or moisture. As a principal member on behalf of Joint Ventures II, Penick began actively recruiting individuals to invest in the development of the polymer.
 
 
 4
 In 1985, Penick first met Merle Wells and informed him of the polymer project. Subsequently, Wells decided to assist in locating potential investors for the business venture and personally invested $30,000 in Pictures to Glass. In May 1987, Penick, Childers, and Ratliff incorporated the company known as Pictures to Glass International, Inc., to replace Joint Ventures II. Pictures to Glass continued to work with Capsulated Systems, Inc., in order to develop the polymer, and Penick continued to persuade individuals to invest in the polymer development project.
 
 
 5
 During the fall of 1987, Donald Hoy met Penick and learned about the polymer technology that Pictures to Glass was attempting to develop with Bob Bayless and Capsulated Systems, Inc. Hoy expressed interest in becoming involved in Penick's business venture, but also attempted to form a relationship with Capsulated Systems that was purportedly independent of Penick's Pictures to Glass, in order to develop other commercial applications for the polymer technology.[1] At about the same time, Penick's relationship with Bill Childers and Jim Ratliff grew increasingly divisive, and Penick began to operate Pictures to Glass on his own.
 
 
 6
 The record indicates that from 1986 until December 1992, Penick raised a total of $700,650 from at least 220 investors, aided at different times by co-defendants Wells and Hoy. Most of the money was raised in the name of Pictures to Glass from 1987 through 1990. During that time, Penick, Wells, and Hoy made various representations to prospective investors in order to gain investments in Pictures to Glass. Jack Penick typically gave presentations before potential investors and indicated that for every dollar invested in the company or lent to a principal in Pictures to Glass, the investor would receive $100 in stock in Pictures to Glass. Penick also asserted that the company had received purchase orders for a specific amount of the polymer product and that Pictures to Glass had ceased accepting orders because the demand had already outstripped supply. Penick promised that Pictures to Glass would be providing income to investors over the next several years and made false claims that profits were guaranteed, saying that the investment was such a "sure thing" that it would pay returns within 60 to 90 days.
 
 
 7
 Pictures to Glass had entered into a contract with Capsulated Systems on October 8, 1987, just prior to Hoy's involvement, in which the parties agreed that Capsulated Systems would develop and manufacture the necessary polymer. Pictures to Glass paid $252,000 to Capsulated Systems in order to cover its development costs. However, Penick, Wells, and Hoy later failed to advise their investors that Capsulated Systems had filed for bankruptcy in April 1, 1985. Even more egregiously, the three defendants failed to inform the investors that Capsulated Systems had converted their Chapter 11 filing to a Chapter 7 filing during the time that they were still soliciting investments.
 
 
 8
 Moreover, during the course of their dealings, Penick, Wells, and Hoy learned through Bob Bayless that the polymer contained a byproduct called toluene, which is carcinogenic. Penick, Wells, and Hoy also learned that the EPA prohibited the development of products that contained toluene and that the technology advanced by Bayless needed to be modified if there were to be any hope of developing the Pictures to Glass project. The three defendants, however, never revealed this information to potential investors.
 
 
 9
 During the height of their fund-raising activities from 1987 to 1990, Penick, Wells, and Hoy joined forces with Don Zoladz and recruited additional investors for the development of the polymer. Zoladz personally invested $20,500 into Pictures to Glass. (Zoladz later became an unindicted co-conspirator as the result of his death shortly before the indictment in this case was returned.)
 
 
 10
 After Hoy became involved in the business venture, Jack Penick occasionally stayed at the guest house located on the same premises as Hoy's residence. Donald Hoy and Jack Penick hosted meetings at Hoy's residence, where potential investors listened to sales presentations regarding Pictures to Glass and the development of the polymer.
 
 
 11
 After Capsulated Systems filed for Chapter 7 proceedings, Bayless's laboratory could no longer maintain its contract with Pictures to Glass to develop the polymer. Consequently, Penick, Wells, Hoy, and Zoladz reorganized and incorporated a new company on October 19, 1990, known as Poly Tri Star, Inc., and began investigating business opportunities with Skiff Craft Boats, ostensibly to explore the possibility of re-coating and waterproofing old wooden boats.
 
 
 12
 Pictures to Glass mailed a letter, dated March 14, 1989, to all of its investors, inviting them to a "thank you dinner" at Don Zoladz's restaurant in Brilliant, Ohio, where further solicitations for funds were made. A second letter, dated December 21, 1990, informed the investors that a new company had been formed, called Poly Tri Star, Inc., and projected a stock offering in the near future. This letter was signed by Don Hoy as president, Donald Zoladz as chairman, Jack Penick, and Merle Wells. Poly Tri Star also sent a separate letter to Steve Perry asking for further patience from Perry, who had expressed frustration with the lack of returns from his investments in Poly Tri Star.
 
 
 13
 Several investors lived outside the state of Ohio and sent checks of $5,000 or more to Pictures to Glass or Poly Tri Star. The defendants also placed numerous phone calls to concerned investors during the period of the offense in order to assure them that the promotion was on the verge of becoming successful. In fact, investors in the fraudulent schemes carried on by the defendants ultimately lost a total of over $700,000.
 
 ANALYSIS
 
 14
 The key question in three of the four issues presented on appeal is whether the district court properly found that Donald Hoy began his fraudulent activities in December 1987. Hoy contends that his involvement did not begin until December 21, 1990, when he signed the "lulling" letter to investors as the president of Poly Tri Star. He claims that he raised funds only for his own businesses, "Hoy International" and "The Marketing Group," which were entities separate from Pictures to Glass International. Hoy also argues that the jury verdicts that acquitted him of substantive offenses committed prior to December 21, 1990, support this claim.
 
 
 15
 Calculation of the loss. As an initial matter, Hoy challenges the amount of fraud loss attributed to him under U.S.S.G. § 2F1.1(b). The presentence report indicated that the total fraud loss attributable to Hoy should include all investments made to Pictures to Glass and to Poly Tri Star from December 10, 1987, through December 1992. The report accordingly attributed $510,150 of the loss to Hoy and recommended a ten-point increase in his offense level, pursuant to § 2F1.1(b)(1)(K) of the sentencing guidelines. The defendant argues that his involvement began on December 21, 1990, and that the loss legitimately attributable to him is limited to $32,000.
 
 
 16
 The calculation of loss caused by fraud under U.S.S.G. § 2F1.1 is a factual matter reviewed under the clearly erroneous standard. United States v. Jones, 933 F.2d 353, 354-55 (6th Cir.1991). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Archer v. Macomb County Bank, 853 F.2d 497, 499 (6th Cir.1988) (quoting Anderson v. Bessemer City, 470 U.S. 564, 575 (1985)). The district court is not required to determine with precision the amount of loss caused by crimes involving fraud or deceit. The lower court need only make a "reasonable estimate of the loss, given the available information." U.S.S.G. § 2F1.1, comment. (n. 8); accord United States v. Kohlbach, 38 F.3d 832, 835 (6th Cir.1994) (citing United States v. Milligan, 17 F.3d 177, 183 (6th Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 211 (1994)).
 
 
 17
 The amount of loss attributable to the defendant is determined according to his relevant conduct as defined under U.S.S.G. § 1B1.3. Relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." U.S.S.G. § 1B1.3(a)(1)(A). If the offense involved a "jointly undertaken criminal activity," as in a case of a criminal plan or scheme undertaken by the defendant in concert with others, whether or not charged as a conspiracy, "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity" are considered relevant conduct. U.S.S.G. § 1B1.3(a)(1)(B). In order for two or more offenses to constitute part of a "common scheme or plan," they must be "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." U.S.S.G. § 1B1.3, comment. (n. 9(A)). The prosecution's burden of proof at sentencing is measured by the less demanding preponderance-of-the-evidence standard. United States v. Moreno, 933 F.2d 362, 374 (6th Cir.), cert. denied sub nom., Morris v. United States, 502 U.S. 895 (1991).
 
 
 18
 The district court found that Hoy's participation in the fraudulent scheme began on December 10, 1987, when he and Jack Penick solicited money from Hoy's associate, Allen Brand. The court further determined that this act constituted an offense substantially connected to the common criminal scheme and, thus, that Hoy was liable for all reasonably foreseeable acts of his co-conspirators committed after December 10, 1987. Accordingly, the lower court attributed to Hoy all funds raised by Pictures to Glass and Poly Tri Star after December 10, 1987, and calculated the loss amount as more than $500,000 but less than $800,000.
 
 
 19
 The preponderance of the evidence supports the district court's finding that Hoy began participating in the fraudulent scheme in December 1987. William Smith, who worked as an independent consultant for Pictures to Glass, testified that from August 1987 to January 1988, Hoy invited his friends, family, and acquaintances to his house in Newark, Ohio, where Jack Penick and other members of Pictures to Glass solicited people to invest in the company. Penick made bald misrepresentations by promising these potential investors a 100:1 return on their investments, indicating that Pictures to Glass had already received specific orders for the polymer (when the company had received none), that the purchase orders outstripped the supply, that the business venture was a "sure thing," and that the money was due to flow in within 60 to 90 days.
 
 
 20
 Allen Brand himself testified that he invested $25,000 in Pictures to Glass after meeting Penick at Hoy's Newark home on December 2, 1987. Brand said that he attended a meeting designed to encourage people to invest in Pictures to Glass and that Hoy distributed a pamphlet entitled "We Are On The Ground Floor of a Great Opportunity...." The pamphlet falsely stated that the United States government had contacted Bayless for the purpose of coating nuclear waste with the polymer. In addition, the document implied that Pictures to Glass had already negotiated contracts with major government defense contractors to use the polymer. It also asserted that "[t]he whole thing is ready to take off...." and that "[w]e conservatively estimate projected net earnings of more than 100 million annually per division! " Brand further testified that during the meeting he was given material indicating that Bayless's polymer was vastly superior to that of potential competitors and that if the Challenger shuttle fuel had been encapsulated with the polymer, it would never have exploded.
 
 
 21
 According to Brand, as the result of Penick's pitch to him and to other potential investors, on December 9, 1987, Brand invested $5,000 in Pictures to Glass and handed the check made payable to "Jack Penick" to Penick and Hoy. On December 18, 1987, Brand invested an additional $10,000 in Pictures to Glass and again gave the check to Penick and Hoy. On January 15, 1988, Brand made his last investment of $10,000 in Pictures to Glass and made the check payable to "Don Hoy."
 
 
 22
 Hoy contends that he raised funds only for his own companies, independent of Pictures to Glass, and that Allen Brand had invested in another entity called The Management Group. Brand, however, testified that The Management Group was merely a "portion of the PGI [Pictures to Glass International] family" that raised money for Pictures to Glass. In addition, Brand stated that The Management Group was organized by Hoy "at the direction of Jack Penick" and had no real purpose apart from funding Pictures to Glass.
 
 
 23
 Merle Wells, who acted as the president of Pictures to Glass from January 1989 to April 1990, also testified that Hoy "assisted" him by "attending meetings, giving counsel ... and [doing] whatever there was to do," and suggested that Hoy received a "cut" or credit for referring investors to Pictures to Glass.
 
 
 24
 The reviewing court must "give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous and shall give due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e) (1996). Although Hoy's testimony conflicted in part with Allen Brand's, we must credit the lower court's determination, based on the preponderance of the evidence, that Hoy aided, abetted, and participated in the fraud beginning on December 10, 1987.[2]
 
 
 25
 Level of participation. Hoy next contends that the district court clearly erred in refusing to decrease his offense level pursuant to U.S.S.G. § 3B1.2, on the theory that his role in the fraud was minor. His argument in this regard is also based on his position that his involvement in the scheme did not begin until December 21, 1990. According to Hoy, approximately $32,000 was received by Poly Tri Star from 17 investors during the period from December 21, 1990, to December 1992. In his view, this represents a mere fraction of the $700,650 lost by the victims and purportedly indicates that his participation in the overall scheme was minor.
 
 
 26
 The decision as to whether to grant a reduction for playing a minor role is within the sound discretion of the trial court and is reviewed by this Court for clear error. United States v. DeFranco, 30 F.3d 664, 669 (6th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 349 (1994). A "minor participant" is "any participant who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2, comment. (n. 3).
 
 
 27
 As previously discussed, the district court did not clearly err in finding that Hoy received money from Allen Brand on behalf of Pictures to Glass and that his full participation in the fraud began on December 10, 1987, and continued over a five-year period, ending in 1992. Thus, the defendant cannot be categorized as a "minor participant."
 
 
 28
 Probationary status. Hoy next contends that the district court erred in adding two points to Hoy's criminal history score under U.S.S.G. § 4A1.1(d) for committing the instant offenses while on probation. He does not dispute the finding that he was on probation from October 25, 1984, through October 23, 1989, but challenges the two level addition by, again, contending that his involvement in the instant offense commenced no earlier than December 21, 1990.
 
 
 29
 This court reviews findings of fact resulting in criminal history enhancements under U.S.S.G. § 4A1.1 under a clearly erroneous standard. United States v. Arellano-Rocha, 946 F.2d 1105, 1106 (5th Cir.1991). Under § 4A1.1(d), "[t]wo points are added if the defendant committed any part of the instant offense (i.e., any relevant conduct) while under any criminal justice sentence, including probation...." U.S.S.G. § 4A1.1(d), comment. (n. 4).
 
 
 30
 As we previously held, the district court did not err in finding that Hoy's participation in the fraudulent scheme began in December 1987, during the period of his probation. Thus, we conclude that the district court did not commit clear error in adding two points to Hoy's criminal history score.
 
 
 31
 Sufficiency of the evidence. Finally, the defendant contends that the district court erred in denying his motion for judgment of acquittal. In reviewing the sufficiency of the evidence to support a criminal conviction, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979).
 
 
 32
 Hoy was convicted of one count of mail fraud, in violation of 18 U.S.C. § 1341 and § 2; four counts of wire fraud, in violation of 18 U.S.C. § 1343 and § 2; and one count of conspiracy, in violation of 18 U.S.C. § 371. The elements of mail fraud are: (1) a scheme to defraud; and (2) use of the mails in furtherance of the scheme. United States v. Smith, 39 F.3d 119, 121 (6th Cir.1994) (citing Pereira v. United States, 347 U.S. 1, 8 (1954)). The prosecution must prove that the defendant possessed the specific intent to deceive or defraud in order to convict him; the issue of fraudulent intent is an issue reserved for the trier of fact. Id. at 121-22. The elements of wire fraud are: (1) scheme to defraud and (2) use of an interstate electronic communication in furtherance of the scheme. Id. at 122 (citing United States v. Morelli, 643 F.2d 402, 411-12 (6th Cir.), cert. denied, 453 U.S. 912 (1981)). The government bears the responsibility of proving specific intent to defraud. Id. In order to prove the elements of conspiracy under 18 U.S.C. § 371, the government must show (1) that the conspiracy was willfully formed and was existing at or about the time alleged; (2) that the accused willfully became a member of the conspiracy; (3) that at least one of the conspirators thereafter knowingly committed at least one of the overt acts charged; and (4) that the overt act was knowingly done in furtherance of some object or purpose of the conspiracy. United States v. Strong, 702 F.2d 97, 100 (6th Cir.1983) (citing United States v. Meyers, 646 F.2d 1142, 1143-44 (6th Cir.1981)).
 
 
 33
 Hoy puts forth one defense against his conviction for wire fraud, mail fraud, and conspiracy: that he acted in good faith with the belief that the plan to market the polymer commercially would bring substantial returns for the investors. "As a court of review," however, "we must draw all available inferences, and resolve all issues of credibility, in favor of the jury's verdict," Brown v. Davis, 752 F.2d 1142, 1147 (6th Cir.1985) (citations omitted), and the jury's resolution of questions of credibility and demeanor is accorded special deference. United States v. Smith, 39 F.3d at 122.
 
 
 34
 Trial transcripts do provide some support for Hoy's argument that Bob Bayless's failure to produce the polymer in a timely manner and to perform the contract contributed to problems facing this doomed venture. Nevertheless, we conclude that there was sufficient evidence to support the jury's finding that Hoy acted with specific intent to defraud. Merle Wells testified that Hoy helped him run Pictures to Glass while he acted as the president, attended meetings, counseled Wells on how to run the company, and received official Pictures to Glass reports. On the basis of Wells's testimony, the jury could have inferred that Hoy had access to information regarding Pictures to Glass and Poly Tri Star and knew about the misinformation that Penick was presenting to the investors. Yet, Hoy invited potential investors to his home where Penick made his customary misrepresentations, stating that investors could expect a 100:1 return on their money, that Pictures to Glass had already received purchase orders in numbers which exceeded foreseeable supply, that profits were guaranteed, and that the money was due within 60 to 90 days. In addition, investors were never informed that Capsulated Systems was in Chapter 11 bankruptcy until December 21, 1990, when Poly Tri Star mailed the "lulling" letter. Moreover, they were not informed that the polymer contained toluene, a hazardous substance prohibited by the EPA, and that the technology advanced by Bayless would have to be modified before production was even feasible.
 
 
 35
 Despite knowledge of these facts, Hoy signed the "lulling" letter sent out on December 21, 1990, as the president of Poly Tri Star company. The letter was mailed to all Pictures to Glass investors and continued to promise a 100:1 return on investments.
 
 
 36
 From all of this, we conclude that sufficient evidence supports the jury's finding that Hoy acted with specific intent to defraud and that the district court properly denied Hoy's motion for judgment of acquittal.
 
 
 37
 Because the district court did not commit clear error in sentencing Hoy or in denying his motion for judgment of acquittal, we AFFIRM the judgment of the district court.
 
 
 
 [1]
 The government challenges Hoy's characterization of The Management Group and Hoy International as separate and distinct entities from Pictures to Glass. Whatever the status of these two businesses, however, the record indicates that Hoy persuaded individuals to invest in Pictures to Glass International. Moreover, Hoy admitted on cross-examination that The Marketing Group raised money for Pictures to Glass so that Pictures to Glass could fulfill its contract with Capsulated Systems
 
 
 [2]
 Hoy argues that since the jury acquitted him of all substantive offenses committed prior to December 21, 1990, the lower court clearly committed error in calculating the amount of loss attributable to him. The case law is clear, however, that despite the jury's verdicts, a sentencing court may still count acquitted conduct as relevant conduct if sufficient evidence provides a basis for the court to believe the conduct did occur. United States v. Moreno, 933 F.2d at 374. This is so because the standard required for conviction, beyond a reasonable doubt, is considerably higher than the preponderance-of-the-evidence standard needed to establish relevant conduct. Id